**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| MONOTYPE IMAGING INC.; MONOTYPE GMBH; MONOTYPE ITC INC.; AND MYFONTS INC. | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. _____ |
| | ) | |
| v. | ) | |
| | ) | |
| CHECKERBOARD, LTD. AND eINVITE, LLC | ) ) | |
| | ) | |
| Defendants. | ) | |

**<u>COMPLAINT</u>**

1.      Plaintiffs Monotype Imaging Inc. ("Monotype Imaging"), Monotype GmbH ("Monotype GmbH"), Monotype ITC Inc. ("ITC"), and MyFonts Inc. ("MyFonts") (together, "Monotype" or "Plaintiffs") are related companies that are leading providers of typeface products and font software programs.  This case concerns the infringement of the federally registered trademarks AVANT GARDE, AVENIR, BALMORAL, BASIC COMMERCIAL, CASCADE SCRIPT,  ERAS, FLORIDIAN, HELVETICA, INDUSTRIA, INSIGNIA, PALATINO, PAPYRUS, PARK AVENUE, TEMPUS, TIMES, UMBRA, ZAPF, and ZAPFINO (the "Federally Registered Marks"), which are owned by Monotype.  It also concerns the infringement of the trademarks AVANT GARDE, HELVETICA, PALATINO, FLORIDIAN, BALMORAL, PAPYRUS, and ZAPF, which are registered in Massachusetts (the "Massachusetts Registered Marks").  Additionally, it concerns the infringement of numerous common law trademarks that also are owned by Monotype (the "Common Law Marks")

(together with the Federally Registered Marks and the Massachusetts Registered Marks, the "Marks").

2.      Monotype has used the Marks to identify their corresponding typefaces and font software programs for many years, and in some cases, decades.  Monotype presently markets over 2,000 different font software programs bearing the Marks and, over the past ten years, Monotype has entered into more than 100,000 license agreements that include the Marks. Monotype has invested millions of dollars establishing and promoting their trademarks generally and, as a result, they have developed valuable goodwill in the Marks.

3.      Monotype recently learned that defendants Checkerboard, Ltd. ("Checkerboard") and eInvite, LLC ("eInvite"), related companies that provide custom invitations and similar custom printed products, have been using the Marks on their various websites.  Monotype has not authorized or licensed either party to use the Marks.

4.      Checkerboard claims to be a licensee of Monotype's font software programs.  As a result, there is little doubt that it was aware of Monotype's prior use of and rights in the Marks at the time it chose to use the Marks.  Upon information and belief, eInvite, as a related company to Checkerboard, was also aware of Monotype's prior use of and rights in the Marks at the time it chose to use the Marks.

5.      Putting aside Defendants' actual knowledge, Defendants are deemed to be on at least constructive notice of Monotype's rights in the Federally Registered Marks and the Massachusetts Registered Marks by virtue of the federal and Massachusetts registrations.  As such, upon information and belief, Defendants' use of identical and confusingly similar marks in connection with typeface of identical designs was intentional and intended to free ride on Monotype's goodwill.

6.      In addition to its trademark infringements, Checkerboard also is in material breach of its licenses to use the font software programs.  Checkerboard has refused to produce a copy of the license that it claims governs its right to use the software, but it contends that the governing license is Monotype's standard End User License Agreement ("EULA"), which accompanied the CDs containing the font software programs from 1992-1997.

7.      The EULAs, which are enforceable contracts, prohibit the sublicensing of the font software to others.  Despite this, upon information and belief, Checkerboard has permitted eInvite (an entity whose formation post-dates the claimed license) to access and use the font software in its business.

8.      The EULAs also limit access and use of the font software programs to the licensee, to permit it to print its custom invitations and other custom printed products using Monotype's font software programs within the licensee's facility.  The EULAs prohibit any access to the Monotype font software programs by third-parties.  Checkerboard's (and now eInvite's) business permits third-party dealers and third-party customers to access a website that allows users to access and use Monotype's software programs from computers located around the world.

9.      In addition to impermissibly sublicensing the font software programs and allowing third-parties access and use of the same, Checkerboard is in further breach of its license agreements insofar as it permits third-parties to print output from the executed font software. The EULAs, consistent with their intent to only permit use of the font software by a licensee at its offices, specifically limit the use of the font software to a single printing device, or, in the later EULAs, a defined number of printing devices.  Checkerboard not only permits any third-

party using its website to print using the software, but it trains its third-party dealers to print proofs using third-party printers and encourages them to print as many copies as they choose.

10.     For more than a year Monotype has repeatedly demanded in writing that Checkerboard cease using the Marks and abide by its existing font software license agreement(s). Checkerboard, however, has strung Monotype along and refused to stop using the Marks or to cure its breach of the existing font software license agreement.

11.     For these reasons and those set forth more fully below, Checkerboard and eInvite have committed trademark infringement in violation of 15 U.S.C. §§ 1114 and 1125, trademark infringement and dilution under Mass. G.L. ch. 110H §§ 12-14, and violations of Mass. G.L. ch. 93A.  In addition, Checkerboard is liable for breach of contract and of the implied covenant of good faith and fair dealing.

## PARTIES

12.     Monotype Imaging is a Delaware corporation with its principal place of business at 500 Unicorn Park Drive, Woburn, Massachusetts 01801.

13.     Monotype GmbH is a foreign limited liability corporation with its principal place of business at Werner-Reimers-StraBe 2-4,61352 Bad Homburg, Germany.

14.     ITC is a New York corporation with its principal place of business at 500 Unicorn Park Drive, Woburn, Massachusetts 01801.

15.     MyFonts Inc. is a Delaware corporation with its principal place of business at 245 First Street, 17th Floor, Cambridge, Massachusetts 02142.

16.     Upon information and belief, defendant Checkerboard is a Massachusetts corporation with its principal place of business at 216 West Boylston Street, West Boylston, Massachusetts, 01583.  It is owned by an individual, Micah Chase.

17.     Upon information and belief, defendant eInvite is a Massachusetts limited liability company with its principal place of business at 216 West Boylston Street, West Boylston, Massachusetts, 01583.  It is owned by an individual, Micah Chase.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and this Court's supplemental jurisdiction under 28 U.S.C. § 1367.

19.     Upon information and belief, venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b) and (c) because this is the judicial district where (i) a substantial part of the events or omissions giving rise to the claim occurred; and (ii) where Defendants are subject to personal jurisdiction.

## FACTS COMMON TO ALL COUNTS

### Plaintiffs' Business

20.     Plaintiffs are technology companies that, among other things, design their own typefaces and license these typefaces, as well as typefaces designed by third-party designers. Typefaces are comprised of uniquely and consistently designed letters and other characters.  For example, this complaint is presented in the typeface identified by the trademark TIMES NEW ROMAN.

21.     Font software programs are computer programs that, when used with appropriate hardware and software, generate human readable renderings of typefaces both temporarily (as on a computer monitor) and permanently (as printed by a printer).  Monotype Imaging creates and owns original font software programs.  It also sublicenses for distribution original font software programs owned by Monotype GmbH, ITC, MyFonts, and others.

22.     Monotype Imaging is comprised of several of the former largest type companies in the world, including Linotype, ITC, Bitstream, AGFA Monotype, and Monotype Typography.

Today, Monotype Imaging is among the world's largest providers of typefaces and font software programs. It owns and operates the website [www.fonts.com](www.fonts.com) which offers for license a library of thousands of different font software programs. It also licenses font software programs to original equipment manufacturers ("OEMs") for use in electronic devices such as computers, printers, mobile phones, and tablets. Its OEM customers include many leading technology companies, including Sony, Hewlett-Packard, and Microsoft.

### Plaintiffs' Trademarks

23.    From the outset Monotype Imaging and its related and predecessor companies have understood the value in distinctive typeface brands, and have made a massive investment of time and money to promote the brands and the goodwill they embody.

24.    For example, Monotype prominently advertises and markets its typeface brands, including the Marks at issue here, on the [www.fonts.com](www.fonts.com) website. Monotype has over 2,000 different font software programs bearing the Marks. Over the past ten years, Plaintiffs have entered into more than 100,000 licenses that include the Marks. These license agreements include OEM customers who have installed Plaintiffs' font software programs bearing or including the Marks in more than 100,000,000 consumer electronics products.

25.    As noted above, Plaintiffs have spent millions of dollars marketing and promoting their trademarks over many years. Consumers exclusively associate the Marks with Plaintiffs as the source of the typefaces and corresponding font software programs. As a result of Plaintiffs' efforts, the Marks have developed substantial and valuable goodwill.

26.    Plaintiffs have applied for and been granted federal trademark registrations as follows:

| Trademark | Owner | Regis. No. | Goods and Services |
|---|---|---|---|
| AVANT GARDE | Monotype ITC Inc. | 2,656,302 | "computer software for use in displaying and printing digital typeface designs and typographic ornaments" |
| AVANT GARDE | Monotype ITC Inc. | 4,232,896 | "computer software for generating typeface designs and ornamental designs; typeface fonts, type fonts and type designs of alphanumerical characters and/or typographical symbols recorded on machine readable media; fonts of typographical characters; printing fonts, namely, typefaces, type fonts and type designs of alphanumeric characters and/or typographical symbols" |
| AVENIR | Monotype GmbH | 3,138,253 | "computer software and downloadable computer software for use in generating, displaying, and printing type fonts; data carriers containing stores typographic typefaces; and computer-readable media with computer-executable instructions for generating, displaying, and printing type fonts" |
| BALMORAL | Monotype ITC Inc. | 2,783,625 | "software featuring digitized typeface designs and typeface fonts" |
| BASIC COMMERCIAL | Monotype GmbH | 3,236,587 | "software containing type fonts; downloadable software containing type |

| | | | |
|---|---|---|---|
| | | | fonts; software for generating, displaying, and printing fonts; data carriers containing software for generating type fonts; data carriers containing type fonts; computer-readable media containing computer-executable instructions for generating, displaying, and printing type fonts" |
| CASCADE SCRIPT | Monotype GmbH | 3,126,209 | "computer software for type fonts, namely, downloadable printing fonts; computer software for generating, displaying and printing fonts; data carriers containing stored type printing fonts; typeface fonts recorded on computer-readable media with computer executable instructions for generating, displaying and printing type fonts" |
| ERAS | Monotype ITC Inc. | 2,656,300 | "computer software for use in displaying and printing digital typeface designs and typographic ornaments" |
| FLORIDIAN | Monotype Imaging Inc. | 3,328,755 | "computer software for generating typeface designs and ornamental designs" |
| HELVETICA | Monotype Imaging Inc. | 3,058,966 | "software for printing type fonts; downloadable software containing type fonts and used for printing said fonts; software for generating, displaying, and printing |

| | | | |
|---|---|---|---|
| | | | fonts; data carriers with software for printing type fonts; and computer-readable media with computer executable instructions for generating, displaying, and printing type font" |
| INDUSTRIA | Monotype GmbH | 2,944,338 | "typeface fonts recorded on magnetic media, optical media, opto-magnetic media, compact discs, DVDs, hard drives; printing fonts" |
| INSIGNIA | Monotype GmbH | 2,710,993 | "typeface fonts recorded on magnetic media, blank magnetic data carriers; printing fonts" |
| PALATINO | Monotype Imaging Inc. | 3,162,014 | "software containing type fonts; downloadable software containing type fonts; software for generating, displaying, and printing type fonts; data carriers containing software for generating type fonts; data carriers containing type fonts; and computer-readable media containing computer-executable instructions for generating, displaying, and printing type fonts" |
| PAPYRUS | Monotype ITC Inc. | 2,578,306 | "software featuring digitized typeface designs and typeface fonts" |
| PARK AVENUE | Monotype GmbH | 3,414,574 | "typographical characters stored on data carriers; computer software for generating typeface designs and ornamental |

| | | | designs; fonts of typographical characters" |
|---|---|---|---|
| TEMPUS | Monotype ITC Inc. | 2,618,151 | "computer software for use in displaying and printing digital typeface designs and typographic ornaments" |
| TIMES | Monotype Imaging Inc. | 2,934,450 | "typeface fonts recorded on magnetic media, and electronic database of digitally stored typographical characters recorded on computer media; printing fonts of typographical characters" |
| UMBRA | Monotype GmbH | 3,351,843 | "computer software for generating typeface designs and ornamental designs; typefaces, type fonts and type designs of alphanumerical characters and typographical symbols recorded on machine readable media" |
| ZAPF | Monotype ITC Inc. | 4,244,809 | "computer software for generating typeface designs and ornamental designs; typeface fonts, type fonts and type designs of alphanumerical characters and/or typographical symbols recorded on a machine readable media; fonts of typographical characters; printing fonts, namely typefaces, type fonts and type designs of alphanumeric characters and/or typographical symbols" |

| | | | |
|---|---|---|---|
| ZAPFINO | Monotype GmbH | 3,186,482 | "software containing type fonts; downloadable software containing type fonts; software for generating, displaying, and printing fonts; data carriers containing software for generating type fonts; data carriers containing type fonts; computer-readable media containing computer executable instructions for generating, displaying, and printing type fonts" |

*See* Exhibit A (federal registration certificates).

27.    Plaintiffs also have applied for and received Massachusetts trademark

registrations as follows:

| Trademark | Owner | Regis. No. | Goods and Services |
|---|---|---|---|
| AVANT GARDE | Monotype ITC Inc. | 79022 | "computer software for use in displaying and printing" |
| HELVETICA | Monotype GmbH | 78118 | "computer software for use in displaying and printing" |
| HELVETICA | Monotype Imaging Inc. | 78107 | "printers' type, specifically typeface design" |
| PALATINO | Monotype Imaging Inc. | 78106 | "printers' type, specifically typeface design" |
| FLORIDIAN | Monotype Imaging Inc. | 79074 | "computer software for the generation of and the actual ty[p]eface [sic] desisns" |

| | | | |
|---|---|---|---|
| BALMORAL | Monotype ITC Inc. | 79071 | "computer software for the generation of and the actual typeface designs" |
| PAPYRUS | Monotype ITC Inc. | 79072 | "computer software for the generation of and the actual typeface designs" |
| ZAPF | Monotype ITC Inc. | 79073 | "c[]omputer [sic] software for the generation of and the actual typeface designs" |

*See* Exhibit B (state registration certificates).

28.     In addition to its federal and state trademark registrations, Plaintiffs own numerous common law trademarks for its font software programs as set forth on Exhibit C. Plaintiffs also have used their Common Law Marks in commerce for many years, and in many cases, for decades.

29.     The Marks are distinctive and have acquired secondary meaning among consumers, who exclusively associate the Marks with Monotype Imaging, ITC, Monotype GmbH, or MyFonts.

30.     Monotype Imaging has entered into intra-company license agreements with the other Monotype Plaintiffs, and it is expressly entitled to use their trademarks and enforce its related companies' rights in the same.

31.     Plaintiffs provide their font software programs to third-parties under a license. Most customers are parties to a standard EULA that accompanies the CD containing the software.  The EULA is a contract that governs the licensee's use of the software programs and prohibits certain uses.  As described more fully below, this is the type of license Checkerboard claims to have and that is the subject of this action.

32.     As technology advanced, Plaintiffs developed new licensing models to allow business customers to use the font software programs in ways that were not contemplated previously or were not previously technologically feasible.  For example, the development and availability of high-speed Internet service and e-commerce led Monotype to develop font licensing models that permitted corporate licensees to allow third-parties to use Monotype's software programs remotely using computers not located on the licensee's premises. In other words, in contrast to older, standard EULAs, this new type of license agreement may allow an unlimited number of Internet users to give instructions to Monotype's font software programs by using keyboards connected to their own personal computers located around the world. Defendants do not have this type of license.

### Defendants and their Businesses

33.     Upon information and belief, Checkerboard and its predecessors historically offered custom printing services by taking orders through the mail or over the telephone.  Its printing services required the use of font software programs, insofar as customers could choose various typefaces for printing on the products they ordered.  Once an order was placed, a sample or "proof" might be printed for approval by the customer before the order was completed.  At the time that Checkerboard licensed the font software, access to and use of the font software was limited to Checkerboard.  Under this prior business model Checkerboard employees accessed and used the font software to create the "proofs," delivered them to the potential customer, and created the final products once the order was confirmed.

34.     Upon information and belief, Checkerboard is a party to one or more Monotype EULAs from 1992 to 1997.  Those EULAs permit Checkerboard to access and use the font software for the activities described in paragraph 33.

35.     Each of those agreements, however, prohibits or limits certain uses of the software.  For example, the 1992-1996 EULAs state that the licensee "shall not sublicense, sell, lease, or otherwise transfer" the software.  The 1997 EULA states that the licensee "may not rent, lease, sublicense, give, lend, or further distribute the Software or Documentation, or any copy thereof, except as expressly provided herein."  *See* Exhibit D at pg. 6, ¶6.

36.     The license agreements from 1992 to 1996 also each grant the licensee the right to use the font software "solely for [the licensee's] own customary business or personal purposes at the address stated on the registration card" submitted to the licensor.  *See id.* at pg. 5, ¶2.  Consistent with this internal use only purpose, all of the EULAs provide that the licensee agrees to "maintain the Software and other Proprietary information in strict confidence and to establish reasonable procedures for regulating access to and use of the Software."  *See id.* at pg. 5, ¶3.

37.     As time passed and licensees with multiple or networked computers became more prevalent, the standard EULA was revised to address different types of new potential uses, but it continued to limit use of the software  to a specific limited number of computers.

38.     Thus, in 1995, the standard EULA specified that the licensee had the right to use the software on "a single computer."  *See id.* at pg. 3, ¶2.  It further provided that, "[i]f you need access to the Software on more than one Computer System, you must pay [Monotype's predecessor] the applicable Fees set forth in [its] then published price list for typefaces used in a multi-system environment."  *See id.*  In 1996 the EULA was further updated to include permitted use on up to 5 or 10 computers, but it still required additional fees for use on additional computer systems.  *See id.* at pg. 5, ¶2.  Likewise, in 1997 the standard EULA was updated again to permit use on up to 5 or 20 computers, again reiterating that use on additional computers required a further license.  *See id.* at pg. 6, ¶2.

14

39.     The EULAs contained additional provisions that further limit a licensee's rights. Specifically, the EULAs, consistent with their intent to only permit use of the font software by the licensee at its offices, specifically limit the use of the font software to a single printing device.  *See id.* at pg. 1, ¶2 (1992-1995 EULA: "Under the terms of this License Agreement, you have the right to use the Software on one printer.  If you need access to the Software on more than one printer, you need to acquire a Multiprinter License Agreement…"); pg. 3, ¶2 (1995 EULA: "Under the terms of this License Agreement, you have the right to use the Software on a single computer and one associated printer…"); pg. 5, ¶2 (1996 EULA: limiting use to "one output device"); and pg. 6 (1997 EULA: limiting use to "one printer" "all located at a single geographic location").  In 1997 the EULA allowed up to two printers, but only if the licensee had acquired an entire Font Software Library package.  *See id.* at pg. 6.

40.     The 1992-1996 EULAs do not grant Checkerboard any rights to use the Marks. The 1997 EULA allowed some use of the trademarks, but only if the use "includ[ed] identification of the trademark owner's name."  *See id.* at pg. 6, ¶5.

**Checkerboard and eInvite's Trademark Infringement and Breach of the License**

41.     Checkerboard and eInvite operate through the websites www.checkernet.com and www.einvite.com.  Upon information and belief, checkernet.com is a website that permits Checkerboard third-party dealers to create custom invitations and other custom printed products, whereas eInvite.com is a website that allows any third-party customer to do the same.

42.     Today, instead of a Checkerboard employee receiving an order in the mail or over the telephone and accessing the font software to input custom text, a third-party does it remotely from his or her own computer.

43.    Specifically, upon information and belief, a dealer can use their own computer to go to www.checkernet.com or a customer can use their own computer to go to www.einvite.com, choose an item to customize, type in the text that they want to customize, and select a typeface design from a drop down menu:



44.    Upon information and belief, this process involves the third-party's computer transmitting instructions to Checkerboard and/or eInvite's web servers or other computers to execute the Monotype font software, render the custom text in the chosen font, and create an image or other file comprised of the custom text in Monotype's font.  That image file is then transmitted from Checkerboard and/or eInvite's web servers or other computers over the Internet

to the customer's computer. The customer is then able to view the executed font and to print the document in the customized text created using the selected font software program on any printer attached to their computer.

45.     For example, if the Court wanted to order a set of custom business cards it could access the www.einvite.com website, chose the type of card it wanted, enter the text it wanted from the Court's computer, e.g., "United States Federal Court Judge," and select a Monotype brand font, such as PAPYRUS. Checkerboard and/or eInvite would then nearly instantaneously transmit the following to the Court's computer screen, which could be viewed on the Court's monitor and printed out on the Court's computer:



46.     Upon information and belief, Checkerboard and eInvite are licensees of a patent owned by an affiliated company, CheckMate Technologies, LLC, insofar as they practice the claimed invention and eInvite's website states that it is "powered by CheckMate™" a

> … special preview technology [that] enables you to personalize your item with your choice of ink colors, lettering styles and sizes, wording, and more. And then see the exact typeset copy of your item (called a "preview") online immediately. Once you submit your

order to us, this exact replica is sent directly to the printer's presses within seconds. Because your wording does not have to be retyped into the printer's system, CheckMate™ saves time and mistakes!

*See* Exhibit E (http://www.einvite.com/info/faq, last visited May 7, 2014).

47.    The CheckMate patent is titled "Interactive print job display system and method," *see* Exhibit F (U.S. Patent No. 6,529,214), and more fully describes the process set forth in paragraphs 41-43 above:

> An interactive image display system for displaying a printed article as it will appear when printed. It includes ***a user interface component, to accept information from a user for producing the printed article, and to provide a graphic image representing the printed article for display to the user***; a graphic layout component, to process the information and produce a graphic description file, which is usable for a batch printing process; and an image producing component, to process the graphic description file and produce the graphic image. The user interface component maintains the information from the user, allowing the user to modify a part of the information in order to view changes in the displayed printed article. This maintained information is also used for producing and displaying a different printed article, and also for ultimately preparing and running the print job for the user. The graphic layout component processes both the images for display to the user and the graphic description file for the print job, thereby guaranteeing that the user views exactly what the printed item will look like. A background image resembling the material to be printed on provides a complete picture. The present invention is well suited for use at an interactive web site allowing users to access it over the Internet, and design and order printed materials such as business cards, wedding invitations, and bar mitzvah invitations. (Emphasis added.)

48.    As described in the patent, the Checkerboard and eInvite systems automatically, and without Checkerboard employee intervention, "accept information from a user" to access and execute the licensed font software programs.  As such, there can be no doubt that it is the third-party user who is accessing and using the licensed font software programs.

49.    Checkerboard's dealer resource webpage expressly encourages third-parties to print electronic proofs by including an instructional video for dealers.  *See* Exhibit G ("Dealer Resources," available at http://www.checkernet.com/info/marketingmaterials/ marketingmaterials.asp?Cobrand=CB&Site=Checkernet&vk=1777211146, last visited May 7,

2014; "How to Use the Printable Proof Feature on Checkernet.com" training video, available at

http://www.youtube.com/watch?v=JaxpHyzGy04, last visited May 7, 2014).  Indeed,

Checkerboard encourages its third-party dealers to print as many samples as they desire.  *Id.*

(training video at 2:14 of 2:28) ("You may print as many online copies of your proof as you

like.").

50.    Upon information and belief, Checkerboard has installed the licensed font

software programs on a number of computers greater than the number authorized by its EULAs.

51.    As early as October 2011, counsel for Monotype contacted Checkerboard to give

it notice of the infringing trademark uses and breach of the EULAs.  The parties engaged in

protracted negotiations that did not result in a new license agreement.

52.    As of the date of this complaint, Checkerboard and eInvite continue to use

Monotype's Marks without authorization, and Checkerboard continues to use Monotype's font

software programs in material breach of the EULAs.

53.    As shown above, Checkerboard and eInvite use Plaintiffs' Marks in commerce in

connection with their Internet businesses.  Checkerboard and eInvite's use is not authorized or

licensed.

54.    Checkerboard and eInvite are using marks that are identical to the Plaintiffs'

Marks in connection with the identical goods that Plaintiffs offer, namely font software

programs.

55.    Checkerboard and eInvite are also using the identical marks on the Internet, which

is the same channel of commerce and marketing that Plaintiffs use.  As set forth above, Plaintiffs

offer their font software programs on the Internet and license others to use their font software on

the Internet.

56.    Checkerboard and eInvite target the same customers as Plaintiffs because its customers are individuals who want to use unique typefaces to customize goods.  If Checkerboard and eInvite were properly licensed, the Marks would be used to attract the identical customers.

57.    Checkerboard and eInvite's intentional use of marks that are identical to the Plaintiffs' Marks, on or in connection with the identical corresponding typefaces is likely to cause confusion, mistake, and deception among customers and potential customers concerning the source or origin of the fonts, and to cause individuals and businesses to erroneously believe that Monotype has an affiliation, connection, or association with Checkerboard and eInvite, or that Monotype has sponsored or approved the use of its marks by Checkerboard and eInvite, all to the irreparable harm and detriment of Monotype and the substantial goodwill it has developed in the Marks.

58.    Importantly, Checkerboard and eInvite do not need to use the Marks to inform their customers how their products will appear.  For example, Checkerboard and eInvite could replace the Marks in their drop down menus with the words "YOUR CUSTOM TEXT HERE" rendered in different typefaces, e.g., "YOUR CUSTOM TEXT HERE," which is shown in the PAPYRUS brand typeface.  This approach permits the customer to make his or her selection and avoids the unlicensed use of Plaintiffs' Marks.  Instead, Checkerboard and eInvite use the trademark name for the fonts.  This is shown above, in Exhibit H ("Checkerboard's List of Typestyles," available at http://www.checkernet.com/info/marketingmaterials/0003_ Customization/Typestyle_List.pdf?Cobrand=CB&Site=Checkernet&vk=1777211146, last visited on May 7, 2014), and in Exhibit I (eInvite's "Font Selection" dialog, accessible through, *e.g.*, http://www.einvite.com/product/detail/EIW-GSE-WENS.html, last visited on May 7, 2014).

59.     In light of the foregoing, Checkerboard and eInvite's use of the Marks is likely to cause confusion, create a likelihood of injury to Plaintiffs' business reputation and/or a likelihood of dilution of the distinctive quality of the Marks, and cause irreparable harm to Plaintiffs.  As a result, Defendants' use of the Marks, and any other confusingly similar marks, should be enjoined.

60.     With respect to the font software programs, the EULAs are valid and subsisting contracts, Monotype performed all of its obligations, and Checkerboard paid its license fees and used Monotype's font software programs in its business for several years.

61.     Checkerboard does not contend that the EULAs are non-binding or unenforceable.  Rather, it contends that it has not breached the EULAs.

62.      As described above, however, Checkerboard has breached material terms of the EULAs in several respects, including, but not limited to:

    a.  Breach of its covenants to limit access to and use of the software by providing eInvite access to and use of the software;

    b.  Breach of its covenants to limit access to and use of the software by providing third-party dealers access to and use of the software;

    c.  Breach of its covenants to limit access to and use of the software by providing third-party customers access to and use of the software;

    d.  Breach of its covenant to "maintain the Software and other Proprietary information in strict confidence and to establish reasonable procedures for regulating access to and use of the Software" by providing access and use as described above;

    e.  Breach of its covenants to limit access to and use of the font software to a specific number of computers and its promises to take a further license for additional access and use;

    f.  Breach of its covenants to only use the font software in connection with a specific number of printers by permitting a greater number of third-parties dealers to print output from the font software; and

     g.   Breach of its covenants to only use the font software in connection with a specific number of printers by permitting a greater number of third-parties customers to print output from the font software.

63.    Checkerboard's present use of the font software also breaches the implied covenant of good faith and fair dealing insofar as the understanding and expectations of the parties was that the font software programs would be accessed and used in a limited manner.  By using the font software in connection with the electronic previews or "proofs" as described above, Checkerboard did not conform to the parties' reasonable understanding of performance obligations, as reflected in the overall spirit of the bargain.

64.    As a direct and proximate cause of Checkerboard's breaches, Plaintiffs have suffered monetary damages and Checkerboard has been unjustly enriched in an amount to be determined at trial.

## COUNT I
### (Trademark Infringement—15 U.S.C. § 1114)
### (Against Checkerboard and eInvite)

65.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 64 above as if fully set forth herein.

66.    As described above, Plaintiffs are the owners of the federally registered AVANT GARDE, AVENIR, BALMORAL, BASIC COMMERCIAL, CASCADE SCRIPT,  ERAS, FLORIDIAN, HELVETICA, INDUSTRIA, INSIGNIA, PALATINO, PAPYRUS, PARK AVENUE, TEMPUS, TIMES, UMBRA, ZAPF, and ZAPFINO marks. Monotype Imaging is the owner or a licensee of the Federally Registered Marks and is expressly authorized to enforce trademark rights in the same.

67.    Plaintiffs' ownership and use in commerce of the Federally Registered Marks predates the use by Checkerboard and eInvite of the identical marks.

68.     Upon information and belief, Checkerboard and eInvite's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Federally Registered Marks. Checkerboard and eInvite are and were at all relevant times at least constructively aware of Plaintiffs' prior use, ownership, and registration, and Checkerboard and eInvite's conduct is therefore also willful and intentional.

69.     Checkerboard and eInvite use the identical marks in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods or services.

70.     Checkerboard and eInvite's use in commerce of the Federally Registered Marks, as described above, constitutes trademark infringement in violation of 15 U.S.C. § 1114 in that it is without Plaintiffs' consent and is likely to cause confusion, mistake, and/or deception among consumers.  Such conduct has and will irreparably harm Plaintiffs and the goodwill they have developed in the Federally Registered Marks.

71.     As a direct and proximate result of Checkerboard and eInvite's violations of 15 U.S.C. § 1114, Plaintiffs have been and will continue to be damaged.

72.     Upon information and belief, Checkerboard and eInvite have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to Plaintiffs as a result of its wrongful conduct.

73.     Checkerboard and eInvite's conduct is causing and will continue to cause Plaintiffs to suffer irreparable harm and, unless Checkerboard and eInvite are restrained, Plaintiffs will continue to be so damaged, because they have no adequate remedy at law.

## COUNT II
### (False Designation of Origin—15 U.S.C. § 1125(a))
### (Against Checkerboard and eInvite)

74.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 73 above as if fully set forth herein.

75.     As described above, Plaintiffs are the owners of the federally registered AVANT GARDE, AVENIR, BALMORAL, BASIC COMMERCIAL, CASCADE SCRIPT,  ERAS, FLORIDIAN, HELVETICA, INDUSTRIA, INSIGNIA, PALATINO, PAPYRUS, PARK AVENUE, TEMPUS, TIMES, UMBRA, ZAPF, and ZAPFINO marks.  In addition, Plaintiffs are the owners of the Common Law Marks listed in Exhibit C.  Monotype Imaging is the owner or a licensee of the Marks and is expressly authorized to enforce trademark rights in the same.

76.     The Marks are distinctive or have acquired secondary meaning among consumers, who exclusively associate the Marks with Monotype Imaging, ITC, Monotype GmbH, or MyFont.

77.     Plaintiffs' ownership and use in commerce of the Marks predates the use by Checkerboard and eInvite of the identical marks. The federal registrations also predate the use by Checkerboard and eInvite of the identical marks.

78.     Upon information and belief, Checkerboard and eInvite's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Marks. Checkerboard and eInvite are and were at all relevant times at least constructively aware of Plaintiffs' prior use, ownership, and/or registration of the Marks, and Checkerboard and eInvite's conduct is therefore also willful and intentional.

24

79.     Checkerboard and eInvite use the identical marks in interstate commerce in connection with the sale, offering for sale, distribution, and/or advertising of its goods or services.

80.     Checkerboard and eInvite's use in commerce of the identical marks, as described above, constitutes false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A) in that it is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Checkerboard and eInvite with Plaintiffs and/or as to the origin, sponsorship, or approval by Plaintiffs of Checkerboard and eInvite's goods, services, or commercial activity. Such conduct has and will irreparably harm Plaintiffs and the goodwill they have developed in Marks.

81.     Upon information and belief, Checkerboard and eInvite have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to Plaintiffs as a result of its wrongful conduct.

82.     Checkerboard and eInvite's conduct is causing and will continue to cause Plaintiffs to suffer irreparable harm and, unless Checkerboard and eInvite are restrained, Plaintiffs will continue to be so damaged, because they have no adequate remedy at law.

### COUNT III
**(Trademark Infringement—Mass. Gen. Laws ch. 110H §§ 12 and 14)**
**(Against Checkerboard and eInvite)**

83.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 82 above as if fully set forth herein.

84.     As described above, Plaintiffs are the owners of the AVANT GARDE, HELVETICA, PALATINO, FLORIDIAN, BALMORAL, PAPYRUS, and ZAPF marks, which

are registered in Massachusetts.  Monotype Imaging is the owner or a licensee of the Marks and expressly authorized to enforce trademark rights in the same.

85.    Plaintiffs' ownership and use in commerce of the Marks predates the use by Checkerboard and eInvite of the identical and confusingly similar marks.

86.    Upon information and belief, Checkerboard and eInvite's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Marks. Checkerboard and eInvite are and were at all relevant times at least constructively aware of Plaintiffs' prior use, ownership, and registration of the Marks, and Checkerboard and eInvite's conduct is therefore also willful and intentional.

87.    Checkerboard and eInvite use the identical marks in Massachusetts in connection with the sale, offering for sale, distribution, and/or advertising of its goods or services.

88.    Checkerboard and eInvite's use of the identical marks, as described above, constitutes trademark infringement in violation of Mass. Gen. Laws ch. 110H §§ 12 and 14 in that it is without Plaintiffs' consent and is likely to cause confusion, mistake, and/or deception among consumers, all to the irreparable injury of Plaintiffs and the goodwill they have developed in the Marks.

89.    As a direct and proximate result of Checkerboard and eInvite violations of Mass. Gen. Laws ch. 110H §§ 12 and 14, Plaintiffs have been and will continue to be damaged.

90.    Upon information and belief, Checkerboard and eInvite have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to Plaintiffs as a result of its wrongful conduct.

91.    Checkerboard and eInvite's conduct is causing and will continue to cause Plaintiffs to suffer irreparable harm and, unless Checkerboard and eInvite are restrained, Plaintiffs will continue to be so damaged, because they have no adequate remedy at law.

**COUNT IV**
**(Trademark Dilution-Mass. Gen. Laws ch. 110H § 13)**
**(Against Checkerboard and eInvite)**

92.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 91 above as if fully set forth herein.

93.    As described above, Plaintiffs are the owners of the AVANT GARDE, HELVETICA, PALATINO, FLORIDIAN, BALMORAL, PAPYRUS, and ZAPF marks, which are registered in Massachusetts.  Monotype Imaging is the owner or a licensee of the Marks and expressly authorized to enforce trademark rights in the same.

94.    The Marks are distinctive or have acquired secondary meaning among consumers, who exclusively associate the Marks with Monotype Imaging, ITC, Monotype, or MyFonts.

95.    Plaintiffs' ownership and use in commerce of the Marks predates the use by Checkerboard and eInvite of the identical and confusingly similar marks.

96.    Upon information and belief, Checkerboard and eInvite's conduct is willful and intentional and intended to free-ride off of the goodwill associated with the Marks. Checkerboard and eInvite are and were at all relevant times at least constructively aware of Plaintiffs' prior use, ownership, and registration of the Marks, and Checkerboard and eInvite's conduct is therefore also willful and intentional.

97.    Checkerboard and eInvite's use in commerce of the identical and confusingly similar identical marks, as described above, constitutes common law and statutory dilution in that it is without Plaintiffs' consent and creates and will continue to create a likelihood of injury

27

to Plaintiffs' business reputation and/or a likelihood of dilution of the distinctive quality of the Marks.

98.     As a direct and proximate result of Checkerboard and eInvite's dilution of the Marks, Plaintiffs have been damaged and will continue to be damaged.

99.     Upon information and belief, Checkerboard and eInvite have realized, and continue to realize, substantial revenues, profits, and other benefits rightfully belonging to Plaintiffs as a result of its wrongful conduct.

**COUNT V**
**(Unfair Competition-Mass. Gen. Laws ch. 93A)**
**(Against Checkerboard and eInvite)**

100.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 99 above as if fully set forth herein.

101.      Plaintiffs and Checkerboard and eInvite are persons engaged in the conduct of trade or commerce within the meaning of Mass. Gen. Laws ch. 93A, § 11.

102.     Checkerboard and eInvite's acts, conduct, and practices described above occurred and are occurring primarily and substantially within the Commonwealth of Massachusetts.

103.     Checkerboard and eInvite's acts, conduct, and practices described above, including without limitation the use of the identical and confusingly similar marks in connection with the promotion, sale, or licensing of services in Massachusetts, constitute unfair methods of competition and/or unfair or deceptive acts or practices, which are unlawful under Mass. Gen. Laws ch. 93A.

104.     As a direct and proximate result of Checkerboard and eInvite's violations of Mass. Gen. Laws ch. 93A, Plaintiffs have been damaged and will continue to be damaged.

28

**COUNT VI**
**(Breach of Contract)**
**(Against Checkerboard)**

105.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through -104 above as if fully set forth herein.

106.    As described above, the foregoing acts of Checkerboard constitute breach of contract, specifically, the EULA(s) Checkerboard claims govern from 1992-1997.

107.    As described above, the EULAs are valid, binding contracts between Plaintiffs and Checkerboard.

108.    As described above, Plaintiffs performed all material parts of the contracts, including providing the licensed products to Checkerboard.

109.    As described above, Checkerboard materially breached the contract(s).

110.    As a direct and proximate cause of Checkerboard's breach, Plaintiffs have suffered monetary damages in an amount to be determined at trial.

**COUNT VII**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**
**(Against Checkerboard)**

111.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 110 above as if fully set forth herein.

112.    As described above, the EULAs are valid, binding contracts between Plaintiffs and Checkerboard and contain an implied covenant of good faith and fair dealing.

113.    As described above, Plaintiffs performed all material parts of the contracts, including providing the licensed products to Checkerboard.

114.    As described above, Checkerboard breached the implied covenant of good faith and fair dealing.

115.    As a direct and proximate cause of Checkerboard's breach, Plaintiffs have suffered monetary damages in an amount to be determined at trial.

## PRAYERS FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.    That this Court permanently enjoin Checkerboard and eInvite, their employees, agents, servants, and all in privity with them, from using any marks confusingly similar to the Marks, or any derivatives thereof or any marks similar thereto, in commerce;

B.    That this Court award Plaintiffs damages in an amount to be determined at trial;

C.    That this Court award Plaintiffs treble damages;

D.    That this Court award Plaintiffs its attorneys' fees and costs; and

E.    That this Court award Plaintiffs such other and further relief that this Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of all claims so triable.

Respectfully submitted,

MONOTYPE IMAGING INC.,
MONOTYPE GMBH, MONOTYPE ITC INC, and
MYFONTS INC.

*/s/ Mark S. Puzella*

Mark S. Puzella (BBO No. 644850)
Sheryl Koval Garko (BBO# 657735)
Andrew Pearson (BBO# 688709)
Fish & Richardson P.C.
One Marina Park Drive
Boston, MA 02210-1878
Phone: (617) 542-5070
Fax: (617) 542-8906
E-Mail:  puzella@fr.com
garko@fr.com
apearson@fr.com

May 9, 2014